JM:SC/SJM
F. #2012R00604

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JAMES ABADIE,

           Defendant.

- - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. 12-274 (ARR)
(T. 18, U.S.C., §§ 1349
and 3551 et seq.)

THE UNITED STATES ATTORNEY CHARGES:

## INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

### I. The Defendant

1. Lend Lease (US) Construction LMB Inc. (formerly Bovis Lend Lease LMB Inc.) ("Bovis") was a construction service corporation that provided construction, project management and consulting services on large-scale public and private construction projects. Bovis was a United States subsidiary of the company Lend Lease Corporation Limited ("Lend Lease"), which, as of 2009, operated in over 40 countries in Asia and Europe, as well as in Australia and the United States.

2. Bovis was one of the largest construction firms in New York City. Bovis operated primarily in the northeast region of the United States, and its New York office was the largest of

its offices. In 2008, Bovis had over 1,000 employees, the majority of which worked in its New York office.

3. Among many others, Bovis provided services on projects that included the United States Courthouse for the Eastern District of New York, the United States Post Office/Bankruptcy Court in Brooklyn, New York, Citifield, the Bronx Criminal Courthouse ("BCC"), Grand Central Terminal and the Deutsche Bank building deconstruction.

4. In or about and between 2002 and June 2009, the defendant JAMES ABADIE was the Principal in Charge of Bovis's New York office. As the Principal in Charge, ABADIE was the highest ranking executive of Bovis's New York office, and all aspects of project operations and union labor issues fell under his supervision. ABADIE joined Bovis in or about 1980 and held various positions prior to 2002, including General Superintendent. As General Superintendent, ABADIE personally oversaw the day-to-day field operations on all projects and had extensive involvement with managing union labor.

II. Bovis's Construction Contracts

5. Bovis's role on construction projects was typically that of a construction manager. This often required Bovis to supervise the work done by the subcontractors or trade contractors involved. As construction manager, Bovis usually executed the "general conditions" contract. The "general conditions" contract included the infrastructure costs of the

construction project not covered by the trade contracts, such as daily trash removal and operation of the elevators and hoists on the construction site. It also included supplying some union labor, such as workers from the Mason Tenders' District Council of Greater New York ("Local 79").

6. The pay rates for Bovis's union labor were defined by collective bargaining agreements. For Local 79 laborers and labor foremen on Bovis projects, the Contractors' Association of Greater New York ("CAGNY") agreement was controlling. The CAGNY agreement provided that Local 79 labor foremen (the "Labor Foremen") were not paid for sick days, vacations or holidays not worked.

7. In order to track union hours worked and bill clients for those hours, Bovis required the Labor Foreman for each project to fill out a single time sheet for the Foreman and the Foreman's crew on a weekly basis. Thereafter, a Bovis superintendent reviewed the completed time sheet for accuracy and signed it. Bovis used the hours listed on the time sheet to calculate the pay for the union workers and to send billing requisitions to Bovis's clients.

8. Public projects and certain projects involving public funding required the submission of certified payrolls, which included sworn statements by Bovis representatives that the hours reflected in the billing requisitions accurately reflected the hours worked and paid by Bovis to its union workers. Bovis

4

generated the certified payrolls for Local 79 workers by using the same time sheets submitted by the Labor Foremen.

III. The Fraudulent Overbilling Scheme

9. From at least January 1999 through approximately June 2009, the defendant JAMES ABADIE, together with others, devised a scheme to defraud federal, state and local government contracting agencies, as well as private clients, by falsely representing in billing requisitions, certified payrolls and other documents submitted by Bovis to agencies for public works contracts, and to its other clients on private construction projects, that all of the hours for which Bovis billed its clients and paid its Labor Foremen were for hours actually worked when they were not.

10. As part of the fraudulent scheme, from at least 1999 through approximately June 2009, Bovis had a systematic practice, employed on virtually all of its projects, of:

(a) adding one to two hours of unworked overtime per day to the time sheets for Labor Foremen;

(b) allowing Labor Foremen to be absent from work for sick days, major holidays and one or two weeks of vacation per year, while Bovis completed and submitted time sheets to its clients as though the Labor Foremen had worked those days;

(c) making extra lump sum and stipend payments to a select group of Labor Foremen from April 2008 through June 2009; and

5

(d) billing its clients for these unworked overtime hours, sick days, holidays and vacation days for which the Labor Foremen were paid, as if the Labor Foremen had actually worked those hours and days, as well as the extra lump sum and stipend payments.

11. The defendant JAMES ABADIE, both as General Superintendent and the Principal in Charge of Bovis's New York office, continued and executed the fraudulent scheme, which had already been in existence at Bovis, and agreed with others to do so, expressly directing his subordinates to carry out the practice of adding unworked hours to Labor Foremen's time sheets.

12. Bovis regularly sent its clients bills that included these unworked hours via the mail or by private and commercial interstate carriers. Bovis's clients were unaware that they were being billed for hours not actually worked, and the defendant JAMES ABADIE knew of the clients' ignorance. Bovis's clients paid Bovis based on these fraudulently inflated bills, often via electronic interstate wire.

### CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD

13. The allegations contained in paragraphs 1 through 12 are realleged and incorporated as if fully set forth in this paragraph.

14. In or about and between January 1999 and June 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JAMES

6

ABADIE, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, (a) to place in authorized depositories for mail matter to be delivered by the United States Postal Service, and cause to be deposited to be sent by private and commercial carriers, and taken and received therefrom, mail matter, contrary to Title 18, United States Code, Section 1341, and (b) to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK